IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENWOOD DIVISION

| | | |
|---|---|---|
| Jerrold A. Watson & Sons, L.L.C. d/b/a Watsonia Farms, | ) ) ) | |
| Plaintiff, | ) ) | |
| -vs- | ) ) | C.A. No. 8:16-cv-02833-HMH |
| C.H. Robinson Company d/b/a Robinson Fresh, | ) ) ) | |
| Defendant. | ) | |

### C. H. ROBINSON COMPANY d/b/a ROBINSON FRESH'S
### MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant C.H. Robinson Company d/b/a Robinson Fresh submits this Memorandum in Support of its Motion for Summary Judgment.

### OVERVIEW

This matter arises out of a contract dispute between a *grower* of organic produce (cucumbers, squash, eggplant, etc.), Plaintiff Jerrold A. Watson & Sons, LLC d/b/a Watsonia Farms ("Watsonia"), and a *marketer* of organic produce, Defendant C.H. Robinson Company d/b/a Robinson Fresh ("Robinson Fresh").[1] In April 2015, Watsonia and Robinson Fresh entered into a Marketing Agreement whereby Robinson Fresh agreed to "endeavor to identify a viable market for [Watsonia's organic produce] that meets its customers' quality and condition requirements, and shall market [Watsonia's organic produce] to such new customers…." (**Exhibit 1**, Marketing Agreement, ¶ 5.a.). Robinson Fresh also agreed to try to sell Watsonia's

---

[1] Robinson Fresh is a division of C.H. Robinson.

organic produce to new customers *if* the parties could mutually agree on pricing and *if* Watsonia obtained the proper food safety requirements.

Robinson Fresh was unable to sell Watsonia's organic produce for a number of reasons, but mainly because (1) the parties could not mutually agree on pricing and (2) Watsonia failed to obtain the proper food safety certifications. Despite the fact that Watsonia itself breached the Marketing Agreement by failing to obtain proper food safety certifications, Watsonia brought the present action against Robinson Fresh for breach of contract, breach of contract accompanied by a fraudulent act, and violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"). Watsonia alleges it planted over 200 additional acres of organic produce to "meet the anticipated requirements of the Marketing Agreement." ("Additional Acreage") (Compl. ¶ 12). Watsonia claims Robinson Fresh should pay Watsonia for "the extra expense of putting additional lands into production, acreage beyond its needs for meeting the demands of its own existing customers" and for lost profits. (Compl. ¶ 10).

Robinson Fresh moves for summary judgment because there is no genuine issue of material fact that:

(1)     Under the Marketing Agreement, the parties had to mutually agree on pricing before any of Watsonia's organic produce could be marketed and sold by Robinson Fresh, and the parties did not mutually agree on pricing;

(2)     Under the Marketing Agreement, Watsonia warranted and represented that it would provide Robinson Fresh with organic produce certified by an approved food safety auditor, and Watsonia breached this warranty and representation when it failed to provide organic produce certified by an approved food safety auditor;

2

(3)     Even assuming the parties had mutually agreed on pricing and Watsonia had provided Robinson Fresh with organic produce certified by an approved food safety auditor, under the Marketing Agreement, Robinson Fresh did not agree to pay Watsonia for the costs associated with the alleged Additional Acreage;

(4)     Watsonia has not established damages in a legally sufficient manner, as Watsonia's damage calculations are speculative and conjectural; and

(5)     Watsonia's claims for breach of contract accompanied by a fraudulent act and violation of SCUTPA are not actionable under the governing law of Minnesota.

## FACTUAL BACKGROUND

Watsonia is a farm located in Monetta, South Carolina. Watsonia grows, harvests, and sells fruits and vegetables, including organic produce.[2] Robinson Fresh markets, sells, and transports fruits and vegetables, including organic produce, across the country. Robinson Fresh works with growers (like Watsonia) to help them market, sell, and transport their fruits and vegetables. Robinson Fresh generally serves as the "marketer or sales agent for the grower." (**Exhibit 2**, Castagnetto Deposition, 44:23 – 45:1). In this instance, Robinson Fresh offered to help Watsonia market and sell organic produce to new customers in exchange for an eight percent commission.

## Marketing Agreement

In April 2015, after a series of negotiations, Robinson Fresh and Watsonia entered into a one-year Marketing Agreement. Under the Marketing Agreement, Robinson Fresh agreed to try

---

[2] Prior to and during the agreement with Robinson Fresh, Watsonia marketed and sold organic produce to numerous already existing customers. In fact, Watsonia prevented Robinson Fresh from marketing and selling Watsonia's organic produce to nearly all of these already existing customers by requiring that Robinson Fresh agree to an extensive customer "do not call list" as a condition of the Marketing Agreement.

to market and sell Watsonia's organic produce at a mutually agreed upon price to be determined

by Jerry Watson of Watsonia and John Pursel of Robinson Fresh:

> **5.** **ROBINSON FRESH Responsibilities**
>
> > **a.** ROBINSON FRESH endeavors to identify a viable market for PRODUCTS that meets its customers' quality and condition requirements, and shall market such PRODUCTS to such new customers … at the FOB prices as determined on a daily basis by Jerrold Watson of GROWER and John Pursel of ROBINSON FRESH

(Ex. 1, Marketing Agreement, ¶ 5.a.) ("PRODUCTS" is defined as "fresh grown produce items

requested by ROBINSON FRESH from time to time"; and "GROWER" is Watsonia). Under the

Marketing Agreement, Watsonia agreed to provide organic produce that met the requirements set

by Robinson Fresh or Robinson Fresh's customers:

> > GROWER shall provide PRODUCTS to ROBINSON FRESH, or ROBINSON FRESH's customers: (i) in the required quantity; (ii) at the required quality specification; (iii) by the delivery date; (iv) at the destination; and (v) that conform to the specifications (type, size, grade, and/or weight) and the other requirements set forth in this Agreement.

(Ex. 1, Marketing Agreement, ¶ 1.b.). This included the requirement that Watsonia provide

Robinson Fresh with organic produce certified by a Global Food Safety Initiative ("GFSI")

approved auditor. To this end, Watsonia expressly warranted and represented that *all* organic

produce it provided Robinson Fresh would be certified by a GFSI approved auditor:

> **2.** **Warranties and Representations** …
>
> > **b.** GROWER warrants and represents that **all** PRODUCTS provided to ROBINSON FRESH under this Agreement shall have been grown, harvested, cooled and packed in compliance with the following food safety requirements …

> v.  Annual Food Safety Audits: GROWER shall obtain, through an approved third party Global Food Safety Audit (GFSI) recognized auditor such as Primus ("Approved Third Party Auditor"), annual audits ("Audits"). GROWER agrees to conduct recurring Audit in order to be compliant with certain customer's food safety specifications (i.e. Walmart)…. GROWER's Audit scores, as measured by the Approved Third Party Auditor, must be 80% or better to continue to source branded and/or non-branded PRODUCTS to ROBINSON FRESH. GROWER acknowledges that certain customers require a 90% or higher on all Audits.

(Ex. 1, Marketing Agreement, ¶ 2.b. & ¶ 2.b.v. (emphasis added)). Thus, Watsonia promised that all organic produce provided to Robinson Fresh would comply with the warranties set forth in the Marketing Agreement, including the warranty that organic produce provided to Robinson Fresh would be grown, harvested, and packed in a manner certified by a GFSI approved auditor:

> **4.  GROWER Responsibilities:** …
>
> **b.**  GROWER shall grow, harvest and pack all PRODUCTS in accordance with all applicable laws and in such a manner that all PRODUCTS may be legally sold in [the] United States and internationally.
>
> **c.**  GROWER will provide PRODUCTS to ROBINSON FRESH under this Agreement that are in full compliance with the obligations, representations and warranties set forth in the Agreement.

(Ex. 1, Marketing Agreement, ¶ 4.b & c.).

## Issues After the Execution of the Marketing Agreement

Issues arose almost immediately after the Agreement was executed in April 2015, and continued until the harvest ended in early October 2015, when South Carolina was hit with catastrophic rainfall and flooding.

5

*First*, Watsonia and Robinson Fresh could not agree on pricing. The Marketing Agreement required Jerry Watson from Watsonia and John Pursel from Robinson Fresh to establish pricing on a daily basis for a number of organic commodities, including cucumber, bell pepper, squash, zucchini, and tomatoes. If pricing was mutually agreed upon, the Marketing Agreement set a weekly minimum goal that Watsonia would attempt to meet and Robinson Fresh would attempt to market and sell to new customers. If pricing was *not* mutually agreed upon, the Marketing Agreement provided Robinson Fresh would not be obligated to try to market or sell Watsonia's produce. Because the parties did not mutually agree to pricing, Robinson Fresh was not obligated to try to market or sell Watsonia's produce.

*Second*, in violation of the Marketing Agreement, Watsonia failed to obtain certification from a GFSI approved auditor until July 2015 and, therefore, did not and could not provide Robinson Fresh with organic produce that complied with the representations and warranties set forth in the Marketing Agreement. Critically, this meant Robinson Fresh could not market and sell Watsonia's organic produce to a number of customers that required certification from a GFSI approved auditor. (Ex. 2, Castagnetto Dep., 80:2-5 ("Most of those retail customers we could not sell the product to once the GFSI audit was not performed based on the contracts we have with those -- those retail customers")).

Despite the problems during the Spring and Summer seasons, Robinson Fresh continued to work with Watsonia to try to identify viable markets for Watsonia's produce during the Fall harvest, which lasted from approximately mid-September (when Watsonia had available produce for the Fall harvest) to early October 2015 (when devastating rainfall and flooding occurred across South Carolina). Robinson Fresh attempted to market and sell what it could during this brief period, but these attempts essentially were unsuccessful.

In December 2015, Watsonia sent Robinson Fresh a letter demanding Robinson Fresh pay for some of the "production costs" associated with the additional 200 or more acres Watsonia allegedly planted for the 2015 harvest because, Watsonia claims, Robinson Fresh "shares some responsibility" for these production costs. (**Exhibit 3**, Dec. 3, 2015 Letter). Robinson Fresh declined to pay Watsonia for the "production costs" associated with the Additional Acres not only because it was not obligated to do so under the Marketing Agreement, but also because Robinson Fresh did not breach the contract—if anything, Watsonia breached the contract when it breached an express warranty and representation it made in the contract concerning food safety requirements.

## ARGUMENT

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it, and the inferences to be drawn from the evidence before it, in the light most favorable to the non-moving party. *Ocheltree v. Scollon Prods., Inc.*, 1998 WL 482783, at *2 (4th Cir. Aug. 11, 1998). To overcome a motion for summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading" and must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). A mere "scintilla" of evidence

supporting the opposing party's position will not suffice; there must be a sufficient showing that

the jury could reasonably find for that party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986), as "[m]ere unsupported speculation ... is not enough to defeat a summary judgment

motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## I.    Under the Marketing Agreement, the Parties Must Mutually Agree on Pricing Before Robinson Fresh Can Market and Sell to Customers, and the Parties Did Not Mutually Agree on Pricing.

Under the Marketing Agreement, Robinson Fresh agreed to "endeavor to identify a viable

market for [Watsonia's organic produce] that meets its customers' quality and condition

requirements, and shall market [Watsonia's organic produce] to such new customers…." (Ex. 1,

Marketing Agreement, ¶ 5.a.). An exhibit to the Marketing Agreement addresses how pricing

would be determined and the obligations of the parties if pricing could not be agreed upon:

> It is understood by all Parties that the Weekly Goal Volume will be directly impacted by the FOB prices set by Jerrold Watson and John Pursel; if in the event the pricing can NOT be mutually agreed upon by both Parties, Jerrold Watson shall have the final decision in setting said prices. If however, pricing IS mutually agreed upon by all Parties, then Robinson Fresh shall be responsible to purchase the Weekly Minimum Goal Volume as set forth above. **It is also mutually understood that a lack of mutually agreed upon pricing by both Parties may impact Robinson Fresh's ability to sell their Weekly Goal Volume; accordingly, in this situation, Robinson Fresh shall not be held financially responsible for any shortfall of Weekly Goal Volume not sold**.

(Ex. 1, Marketing Agreement, Exhibit B (emphasis added)).

The Marketing Agreement unambiguously requires that the parties must mutually agree

on pricing. *Brookfield Trade Cntr., Inc. v. Cnty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998)

("The construction and effect of a contract presents a question of law, unless an ambiguity

exists.").[3] The Marketing Agreement unambiguously provides that if Jerry Watson of Watsonia and John Pursel of Robinson Fresh cannot mutually agree on pricing, Robinson Fresh is not obligated to try to sell Watsonia's produce. Thus, if John Pursel does not agree to the pricing quoted by Jerry Watson, then Robinson Fresh is not obligated to try to sell Watsonia's produce.

There is no genuine issue of material fact that Jerry Watson and John Pursel did not **mutually agree** on pricing. Jerry Watson and John Pursel communicated by phone, because Jerry Watson does not read emails. (**Exhibit 5**, John Pursel Deposition, 115:15-21). Jerry Watson would verbally provide Pursel an initial quoted price, but John Pursel did not agree to this initial quoted price—and could not do so because he did not yet know if a Robinson Fresh customer would be willing to pay the initial quoted price. (**Exhibit 6**, John Pursel Affidavit, ¶ 5 and ¶ 7). If a customer was willing to pay Jerry Watson's initial quoted price, Pursel would call Jerry Watson back and agree to the initial quoted price. (Ex. 6, John Pursel Affidavit, ¶ 8). If a customer was *not* willing to pay Jerry Watson's initial quoted price, then Pursel would call Jerry Watson back and attempt to negotiate a lower price. (Ex. 6, John Pursel Affidavit, ¶ 9). However, attempts to negotiate a lower price with Jerry Watson were almost always futile. (Ex. 6, John Pursel Affidavit, ¶ 11). (Ex. 5, Pursel Dep., 124:1-8). On a number of occasions, Pursel told Jerry Watson the quoted pricing was too high. (Ex. 6, John Pursel Affidavit, ¶ 10). (Ex. 5, Pursel Dep., 122:3-10). Pursel also requested Jerry Watson lower the price, but Jerry Watson refused, even when Pursel told him customers were requesting a lower price because of the market. (Ex. 6, John Pursel Affidavit, ¶ 11) (Ex. 5, Pursel Dep., 123:6-23). Because customers were not willing to purchase Watsonia's produce at Jerry Watson's quoted price (and because Jerry

---

[3] The Marketing Agreement is governed by Minnesota law, as Watsonia admits. (**Exhibit 4**, Watsonia's Answers to Requests to Admit, No. 7).

Watson often refused to lower the price in a timely manner, if at all), John Pursel did not mutually agree to Jerry Watson's quoted pricing. (Ex. 6, John Pursel Affidavit, ¶ 14).

Watsonia does not dispute the fact that Pursel did not affirmatively agree to Jerry Watson's quoted pricing. Jerry Watson admits Pursel never affirmatively agreed to his quoted pricing, and admits Pursel never guaranteed or promised he would sell Watsonia's produce at his quoted pricing:

> Q.    Did [Pursel] ever affirmatively say, yes, I will sell it at that price?
>
> A.    No
>
> Q.    Did he say, I'll guarantee that I'll sell it at the price?
>
> A.    No.
>
> Q.    Did he ever promise that he'll sell it at that price?
>
> A.    He never said, you know -- he never had any orders to sell at that price. He just -- he never said, I promise I'll sell it at that price. Not verbally to me. **He never said, I'll sell it at that price, no**.
>
> Q.    So he never affirmatively on the phone said, I will agree to sell squash at $23 tomorrow or today or whenever?
>
> A.    **No, sir.**

(**Exhibit 7**, Jerrold Watson Dep., 106:21-107:13 (emphasis added)). Thus, there is no genuine issue of material fact that Watsonia and Robinson Fresh did not mutually agree on pricing.

Watsonia, however, claims that because Pursel did not affirmatively object to Jerry Watson's quoted pricing, then Pursel must have affirmatively agreed to Jerry Watson's quoted pricing. In other words, silence is acceptance. This is not the law, and is not a reasonable interpretation of the agreement. *Cargill Inc. v. Jorgenson Farms*, 719 N.W.2d 226, 233 (Minn. Ct. App. 2006) ("Ordinarily, mere silence does not amount to an acceptance."); *Grandoe Corp.*

*v. Gander Mountain Co.*, 761 F.3d 876, 888 (8th Cir. 2014) (same); *see also Williston on Contracts* § 6:50 ("As a general rule, an offeree does not need to reply to an offer, and its silence and inaction will not be construed as an assent to an offer.").

Under Watsonia's theory, if Jerry Watson quoted a price and Pursel did not immediately object to that price, then Pursel agreed to that price. This is not a reasonable interpretation of the Marketing Agreement. *Halla Nursery, Inc. v. City of Chanhassen*, 781 N.W.2d 880, 884 (Minn. 2010) ("When interpreting a contract, we must determine if the language is clear and unambiguous, meaning it has only one reasonable interpretation"). If Watsonia is correct, then John Pursel was required to object to Jerry Watson's initial quoted price, or else he agreed to it. But this does not make sense. When Jerry Watson provides Pursel with the opening quoted price, Pursel has no idea whether a customer would be willing to pay for Watsonia's produce at that price or not. (Ex. 6, John Pursel Affidavit, ¶7). Pursel has to contact Robinson Fresh's customers, and find out if they will purchase Watsonia's produce at Jerry Watson's quoted price. Consequently, there can be no mutual agreement on the price until Pursel finds a Robinson Fresh customer willing to pay for Watsonia's produce at Jerry Watson's quoted price, at which point Pursel would call Jerry Watson back and agree to his quoted pricing. Otherwise, there is no mutual agreement. Watsonia's argument—that if Pursel does not immediately object to Jerry Watson's initial quoted pricing, he agrees to the initial quoted pricing—is simply not a reasonable interpretation of the Marketing Agreement.

Because there is no genuine issue of material fact that Watsonia and Robinson Fresh did not mutually agree to pricing, as required by the Marketing Agreement, Robinson Fresh did not breach the Marketing Agreement as a matter of law.

## II. In Violation of the Marketing Agreement, Watsonia Did Not Provide Organic Produce Certified by a GFSI Approved Auditor Until July 2015.

The Marketing Agreement expressly requires Watsonia to provide Robinson Fresh organic produce certified by a GFSI approved auditor. In fact, Watsonia *warranted* and *represented* that it would do so. A warranty is "an express or implied promise that something in furtherance of the contract is guaranteed by one of the contracting parties … a stipulation forming a part of the contract as it has been completed, and is construed as a condition precedent, which must be strictly complied with to the minutest detail, or else the contract is rendered void…." (*Black's Law Dictionary* (10th ed. 2014)). Therefore, Watsonia warranted—as a condition precedent to the contract—that it would provide organic produce certified by a GFSI approved auditor.

There is no genuine issue of material fact that Watsonia did not and could not provide Robinson Fresh with organic produce certified by a GFSI approved auditor prior to July 2015. Becca Watson, Watsonia's Food Safety Manager, admitted Watsonia did not obtain certification from a GFSI approved auditor until July 2015. (**Exhibit 8**, Deposition of Becca Watson, 66:23-25 – 67:1-20). In July 2015, Watsonia obtained certificates from a GFSI approved auditor, Primus. These certificates are dated July 13, 2015, and are valid for an annual period from July 13, 2015 to July 13, 2016. (**Exhibit 9**, Primus Certificates). Because there is no genuine issue of material fact that Watsonia did not provide Robinson Fresh with organic produce certified by a GFSI approved auditor until July 13, 2015, Robinson Fresh cannot be held liable for allegedly failing to market or sell Watsonia's produce before that time as a matter of law.

Watsonia likely will counter with two arguments.

*First*, Watsonia has argued that during contract negotiations, Robinson Fresh told Watsonia that Watsonia was not required to provide organic produce certified by a GFSI

approved auditor. Robinson Fresh categorically denies this allegation, and the Robinson Fresh representatives involved in the contract negotiations made it clear to Watsonia that GFSI level certification would be required. (Ex. 2, Castagnetto Dep., 60:8-13; Ex. 5, Pursel Dep. 24:5-18).[4] For purposes of summary judgment, however, there is no genuine issue of material fact that the Marketing Agreement required Watsonia provide organic produce certified by a GFSI approved auditor, and any alleged agreement made during contract negotiations is barred by the parol evidence rule or trumped by the express terms of the Marketing Agreement itself.

The parol evidence rule "prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing." *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minnesota*, 664 N.W.2d 303, 312 (Minn. 2003). "Accordingly, 'when parties reduce their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement.'" *Id.* (*quoting Hruska v. Chandler Assoc's., Inc.*, 372 N.W.2d 709, 713 (Minn. 1985)). Therefore, even if the parties purportedly agreed during settlement negotiations that Watsonia could provide organic produce that was not certified by a GFSI approved auditor (which is denied, and is in direct contravention of the Marketing Agreement), such evidence is barred by the parol evidence rule. *See Housing and Redevelopment Auth. for the City of Minneapolis v. First Ave. Realty Co.,* 133 N.W.2d 645,

---

[4] Robinson Fresh's director of global sourcing, Michael Castagnetto, testified that during the contract negotiations he "very clearly told them all that we required GFSI audit minimums to market their product," which was a "requirement for our own internal policies and a customer requirement for many of the contracts that we have with customers." (Ex. 2, Castagnetto Dep., 60:8-13 & 60:25 – 61:1-2). Jerry Watson testified that he could not remember anyone from Robinson Fresh saying Watsonia's current food safety certifications were good during the contract negotiations; rather, he claims, nobody from Robinson Fresh said otherwise. (Ex. 7, Jerrold Watson Dep., 113:14-25).

649 (Minn. 1965) (excluding statements regarding pre-contract negotiations under the parol evidence rule).

Moreover, the Marketing Agreement speaks for itself. Watsonia and Robinson Fresh entered into a negotiated, arms-length transaction. Jerry Watson, Joe Watson, and Diedrich Von Soosten[5] all admitted they read and reviewed the Marketing Agreement before it was executed. (Ex. 4, Watsonia's Answers to Requests to Admit, Nos. 3, 4, and 5). Jerry Watson and Joe Watson have decades of experience growing organic produce, and could have readily revised the agreement to reflect what they claim Robinson Fresh allegedly agreed to during the contract negotiations. Von Soosten admitted he read the specific section requiring Watsonia to obtain certification from a GFSI approved auditor and, in fact, made a revision within that same section prior to execution. (**Exhibit 10**, Von Soosten Dep., 120:9-25 – 121:1-25).

*Second*, Watsonia has also argued that it satisfied the requirement that it provide organic produce certified by a GFSI approved auditor because it obtained the "annual" audit within a year. This is a linguistic red herring. Essentially, Watsonia claims as long as it obtained the proper food safety certification within a year, then it did not breach the promise to provide Robinson Fresh with organic produce certified by a GFSI approved auditor. Thus, according to Watsonia, under the one-year Marketing Agreement, Watsonia could obtain the proper food safety certification on the last day of the agreement. This is not what the Marketing Agreement says, and is not a reasonable interpretation of the Marketing Agreement when read as a whole. *Halla Nursery*, 781 N.W.2d at 884. ("The determination of whether a contract is unambiguous depends on the meaning assigned to the words and phrases in accordance with the apparent

---

[5] Von Soosten is a "turnaround man," in that he helps "growers turn things around." (Ex.7, Jerrold Watson Dep., 172:18-24). In this instance, Von Soosten helped Watsonia out of a bankruptcy. Von Soosten was heavily involved in the negotiations with Robinson Fresh and is by Jerry Watson's own admission a sophisticated party. (Ex. 7, Jerrold Watson Dep., 173:4-9).

purpose of the contract as a whole."). When read as a whole, under the Marketing Agreement, Watsonia promised, warranted, and represented that it would provide Robinson Fresh organic produce certified by a GFSI approved auditor. That the audits themselves are usually issued and valid on an annual basis does not mean that Watsonia had a year to satisfy what it warranted and represented to Robinson Fresh as a condition precedent to the agreement. This Court should decline Watsonia's invitation to so torture the meaning of the contract. *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 671 N.W.2d 213, 221 (Minn. App. 2003) ("When the intent of the parties can be determined from the writing of the contract, the construction of the instrument is a question of law for the court to resolve…").

## III.    Under the Marketing Agreement, Robinson Fresh Did Not Promise to Pay for the Costs Associated with Planting the Additional Acreage.

Nowhere in the Marketing Agreement did Robinson Fresh agree to pay Watsonia for the costs associated with the Additional Acreage. Rather, under the Marketing Agreement, Robinson Fresh agreed to endeavor to find new markets to market and sell Watsonia's produce. If the parties agreed on pricing, Robinson Fresh would try to sell Watsonia's produce in exchange for an eight percent commission. This obviously did not occur, largely for the reasons outlined above. That Watsonia made an independent business decision to plant the Additional Acreage in the belief that the Marketing Agreement would be successful, does not mean Robinson Fresh agreed to pay for the cost associated with the Additional Acreage if the Marketing Agreement was unsuccessful. Consequently, there is no genuine issue of material fact that under the Marketing Agreement Robinson Fresh did not agree to pay for the costs associated with the Additional Acreage.

**IV.**    **<u>Watsonia's Damages are Speculative and Conjectural</u>.**

Under Minnesota law, to establish a claim for breach of contract, the plaintiff must establish damages. *See, e.g., In re Health Risk Mgmt., Inc.*, 319 B.R. 181, 187 (D. Minn. 2005) ("The elements of a breach of contract action are (a) formation of a contract, (b) performance by the plaintiff of any conditions precedent to the right to demand performance by the defendant, (c) breach of the contract by the defendant, and (d) damages."). The plaintiff cannot recover speculative or conjectural damages. *Cardinal Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260, 267 (Minn. 1980) ("The controlling principle is that speculative, remote, or conjectural damages are not recoverable"). To establish a lost-profits claim, the plaintiff must prove that "(a) profits were lost, (b) the loss was directly caused by the breach of the [contract], and (c) the amount of such causally related loss is capable of calculation with reasonable certainty rather than benevolent speculation." *B&Y Metal Painting, Inc. v. Ball*, 279 N.W.2d 813, 816 (Minn. 1979). Damages are an essential element of a breach of contract action and, if they are not proven, the Court may grant a motion for summary judgment. *See Sloggy v. Crescent Creamery Co.*, 75 N.W. 225, 226 (Minn. 1898) (affirming dismissal of breach of contract action when the plaintiff could not demonstrate that its damages arose from the contract).

Watsonia's purported damages, including alleged damages for lost profits, are speculative and conjectural. Watsonia calculates its damages as the difference in the total costs Watsonia incurred for the 2014 season and the total costs Watsonia incurred for the 2015 season. That's it. Watsonia contends Robinson Fresh is liable for the increase in all costs related to Watsonia's

16

farming operations from 2014 to 2015, regardless of any and all other external factors that may have caused the increase.[6]

Von Soosten, a "turnaround man" who helped Watsonia emerge from bankruptcy, has provided a chart showing Watsonia's alleged damages as a result of the breach. In preparing the chart, Von Soosten did not consult any accountant, economist, or other third-party professional. (Ex. 10, Von Soosten Dep., 149:3-22). Von Soosten did not verify any of the information presented in the chart, or confer with any reference materials or other external sources. (Ex. 10, Von Soosten Dep. 149:23-24 – 150:1-23). Importantly, Von Soosten did not consider any external factors that might have caused costs to increase between 2014 and 2015:

> Q.    So for payroll, that didn't include any additional costs that may be associated with payroll that were unrelated to the agreement with [Robinson Fresh], correct?
>
> A.    That's correct.
>
> Q.    Contract labor. Do you know whether contract labor increased between 2014 and 2015 across the board?
>
> A.    I don't.
>
> Q.    Did you review any statistics or review any outside resources and determine whether labor in the Southeast increased from 2014 to [2015]?
>
> A.    No.
>
> Q.    Seed and Transplants. Did you include in this calculation any potential increase in price between first seed and/or transplants related to the crops involved in this suit.
>
> A.    No.

---

[6] Watsonia also includes the total costs of the entire farm, including all fruits and vegetables grown on the farm, and not just the costs related to the specific organic produce at issue in the Marketing Agreement.

17

> Q.    Chemicals, same question. Did you include in this calculation any potential increase in the cost of chemicals?
>
> A.    No.

(Ex. 10, Von Soosten Dep., 162:8-25 – 163:14).

Jay Gibson, a Certified Public Accountant and shareholder of Elliott Davis Decosimo, LLC ("Elliott Davis"), an accounting firm, performed an independent analysis of Von Soosten's chart. Elliott Davis opines that the purported damages set forth by Von Soosten are speculative, do not apply accepted methodology, and were not prepared by an independent party:

> 1.    If any financial damages were suffered by Watsonia Farms, the Von Soosten calculations do not properly measure any such damages.
>
> 2.    The Von Soosten calculations and conclusions are based on speculative assumptions and therefore are speculative in nature.
>
> 3.    The Von Soosten calculations do not follow accepted methodologies for the calculation of economic damages, including, but not limited to, lost profits.
>
> 4.    The Von Soosten calculations have not been prepared by a party independent of the parties to this litigation.

(**Exhibit 11**, Gibson Report, p. 1). As Gibson notes, Von Soosten performed no analysis as to whether external factors unrelated to the Marketing Agreement caused or contributed to this increase. Von Soosten admitted so in his deposition:

> Q.    And do you account for any other reasons for why costs would go up from year to year?

18

> A.    We don't.
>
> Q.    So if fertilizer got more expensive between 2014 and 2015, this chart does not account for that?
>
> A.    It does not account for that. If the price went down it doesn't account for that, either.

(Ex.10, Von Soosten Dep., 160:18-25). Elliott Davis opines that "to make the assumption that all of this increase was due to the Marketing Agreement seems presumptive at best and speculative at worst." (Ex.11, Gibson Report, p. 6).

Watsonia's alleged damages are wholly speculative and conjectural—again, simply the increase in the total costs Watsonia incurred for the 2014 season and the total costs Watsonia incurred for the 2015 season. As Gibson puts it, "The Von Soosten calculations simply seem to make the speculative and unsubstantiated assumption that every dollar of change in every expense from 2014 to 2015 is a result of the Marketing Agreement and the actions of Robinson Fresh related thereto." (Ex.11, Gibson Report, p. 6). Watsonia makes no attempt to separate alleged damages arising from their claims against Robinson Fresh and increases in costs unrelated to the Marketing Agreement. Watsonia improperly attributes the entire difference between costs incurred in the 2014 season and the 2015 season to Robinson Fresh, with no consideration given to any other market changes.

Importantly, the opinions of Elliott Davis are uncontroverted. Watsonia did not retain an expert to explain its alleged damages, including alleged lost profits. Accordingly, there is no genuine issue of material fact that Watsonia's damages are speculative and conjectural and, therefore, Robinson Fresh is entitled to judgment as a matter of law. *Curtis v. Jennie-O Turkey Store, Inc.*, No. A10-50, 2010 WL 3546232, at *4 (Minn. App. Sept. 14, 2010) ("Whether damages have been or may be established with reasonable certainty … depends upon the

19

circumstances of the particular case…. A plaintiff's failure to submit evidence of damages into the district court record in response to a motion for summary judgment justifies a district court's decision to grant the motion."); *see also Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 812 (Minn. App. 2007) (affirming grant of summary judgment because plaintiff's evidence of damages was considered too remote or speculative). Moreover, "[w]hen a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage." *MCI Communications Corp. v. American Tel. and Tel. Co.*, 708 F.2d 1081, 1162 (7th Cir. 1983).

## V.    Watsonia's Claims for Breach of Contract Accompanied by a Fraudulent Act and Violation of SCUTPA Must Be Dismissed Because They Are Not Recognized Under Minnesota Law.

Watsonia admits the Marketing Agreement is governed by Minnesota law. (Ex. 4, Watsonia's Answers to Requests to Admit, No. 7). Accordingly, this Court should look to the law of Minnesota to determine whether the claims at issue relate to the formation of the contract or its performance. *Bunker Holdings, Ltd. v. Green Pacific A/S*, 346 Fed. Appx. 969, 973 (4th Cir. 2009) ("[T]he scope of the choice-of-law provision … being a matter of contract interpretation, must be determined by the law of the state chosen by the parties to the contract.").

Minnesota does not recognize a cause of action for breach of contract accompanied by a fraudulent act or violation of SCUTPA. Therefore, both causes of action should be dismissed. *See PCJ Franchising Co., LLC v. Newsome*, No. 7:08-CV-41-BO, 2008 WL 4772191, at *2 (E.D.N.C. Oct. 28, 2008) (dismissing a South Carolina Unfair Trade Practices Act claim based on a choice of law provision designating North Carolina law as the applicable law); *see also* 17B

C.J.S. *Contracts* § 825 (Minnesota is not included in the list of states which recognize a cause of action for breach of contract accompanied by a fraudulent act).[7]

Minnesota also does not recognize a cause of action for violation of SCUTPA, but does have its own unfair trade practices act. However, there is no genuine dispute that a cause of action based on the Minnesota Unlawful Trade Practices Act fails as a matter of law. The Minnesota act requires a plaintiff prove (1) the defendant made false statements about its own product; (2) those statements actually deceived or have the tendency to deceive a substantial segment of their audience; (3) such deception is material because it is likely to influence buying decisions; (4) defendant caused its misrepresented goods to enter into interstate commerce; and (5) plaintiff has been or is likely to be injured as the result of the misrepresentations. *See* Minn. Stat. §325D.09; *Nordale, Inc. v. Samsco, Inc.*, 830 F. Supp. 1263, 1272 (D. Minn. 1993). The Minnesota unlawful trade practices act applies to specific and narrow circumstances. Plaintiff's allegations would not be considered unlawful trade practices as defined by Minnesota law because Minnesota's act focuses on consumers and customers, not disputes between private businesses. *See, e.g.,* Minn. Stat. §§ 325D.09, 325D.11, 325D.12 & 325D.13. Moreover, Robinson Fresh has not placed any products into the stream of commerce as required by the

---

[7] Even assuming South Carolina law applies, there is no material evidence supporting a claim for breach of contract accompanied by a fraudulent act. "In an action for breach of contract accompanied by a fraudulent act, the fraudulent act element is met by an element characterized by dishonesty in fact, unfair dealing, or the unlawful appropriation of another's property by design." *Perry v. Green*, 437 S.E.2d 150, 152 (S.C. Ct. App. 1993). Watsonia has provided no evidence of any alleged fraudulent act committed by Robinson Fresh. There is also no material evidence supporting a claim for violation of SCUTPA. This is a contractual dispute between two private parties with no impact on the South Carolina public, and SCUTPA cannot be used as a means to address private wrongs if the public interest has not been affected. *LaMotte v. Punch Line of Columbia, Inc.*, 370 S.E.2d 711, 713 (S.C. 1988). Moreover, Watsonia has provided no material evidence that the alleged actions by Robinson Fresh are capable of repetition as required by the act. *See Hollman v. Woolfson*, 683 S.E.2d 495, 499 (S.C. 2009).

applicable statute. *See Nordale*, 830 F. Supp. at 1272. Therefore, Watsonia cannot pursue this claim as a matter of law.

## **CONCLUSION**

For the above reasons, Robinson Fresh respectfully requests this Court grant its Motion for Summary Judgment.

s/ Jason D. Maertens
Robert D. Moseley, Jr. (#5526)
Jason D. Maertens (#10144)
Emily I. Bridges (#12258)
Smith Moore Leatherwood LLP
2 West Washington Street, Suite 1100 (29601)
Post Office Box 87
Greenville, South Carolina 29602-0087
(864) 751-7600
(864) 751-7800 (fax)
rob.moseley@smithmoorelaw.com
jason.maertens@smithmoorelaw.com
emily.bridges@smithmoorelaw.com

*Attorneys for Defendant C.H. Robinson Company d/b/a Robinson Fresh*

July 19, 2017